FILED
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**March 13, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

_____

JANE DOE, an individual; MARY DOE, an individual; JAMES DOE, an individual,

      Plaintiffs - Appellants,

v.

BOARD OF TRUSTEES OF SUBLETTE COUNTY SCHOOL DISTRICT NO. 9; SUPERINTENDENT STEVE LOYD, of Sublette County School District No. 9, in his individual capacity; STEVE LOYD, Title IX Coordinator, in his individual capacity; MR. JEFF MAKELKY, Principal, of Big Piney High School, in his individual capacity and JOHN SMITHS, 1-5,

      Defendants - Appellees.

No. 23-8001
(D.C. No. 2:21-CV-00106-ABJ)
(D. Wyo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **ROSSMAN**, **KELLY**, and **MURPHY**, Circuit Judges.
_____

**I. INTRODUCTION**

Jane, James, and Mary Doe filed a complaint asserting claims under Title IX

of the Education Amendments of 1972, 20 U.S.C. §§ 1681 to 1688, and 42 U.S.C.

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

§ 1983. The Does' claims were asserted against, inter alia, the Board of Trustees of Sublette County School District No. 9, Superintendent Steve Loyd, and Principal Jeff Makelky (hereinafter referred to collectively as "the Board"). The Board sought summary judgment on at least the following two grounds: (1) the Does' complaint was filed outside of the applicable statute of limitations and (2) the claims set out in the amended complaint failed on the merits. The district court ruled in favor of the Board on both grounds and entered judgment accordingly. The Does appeal, asserting the district court erred in ruling their claims untimely and without merit. This court holds *Varnell v. Dora Consol. Sch. Dist.*, 756 F.3d 1208 (10th Cir. 2014) compels the conclusion that the Does' claims are untimely. Thus, exercising jurisdiction pursuant to 28 U.S.C. § 1291, this court **affirms** the district court's judgment.

## II. BACKGROUND

### A. Factual Background[1]

This case arises out of the alleged sexual harassment and assault of Jane Doe by Aaron Makelky.[2] During much of the relevant period, Jane was a student and Aaron a teacher at Big Piney High School. The relationship between Jane and Aaron

---

[1] Because we resolve this appeal on timeliness grounds alone, this court sets out a significantly limited overview of the background facts. Any genuine factual disputes are viewed in the manner most favorable to the Does, the non-moving parties. *McKissick v. Yuen*, 618 F.3d 1177, 1184 (10th Cir. 2010). Notably, although the parties dispute the legal implications of the facts relevant to the issue of timeliness, they do not meaningfully dispute the relevant background facts.

[2] Aaron Makelky is the son of defendant Jeff Makelky. [Dist. Ct. Order at 10] To avoid confusion, this opinion uses first names when referring to the Makelkys. The same protocol is used as to the plaintiffs Jane, James, and Mary Doe.

started in the fall of 2014, when Jane was placed in Aaron's tenth-grade history class. In the middle of the school year, Jane's sophomore year, Aaron taught a lesson encouraging students to do their best. Jane was struggling academically and this lesson resonated with her. Jane's grades improved and she started confiding in Aaron. Jane also began occasionally babysitting for Aaron's family. Because Jane did not have a driver's license, Aaron would pick her up from her house.

During the summer of 2015, Jane began exercising in the school weight room. There were usually other students in the weight room during Jane's workouts and her father, James, would often join her. Aaron and other teachers were responsible for overseeing the weight room. Jane continued to work out in the weight room during her junior and senior years. There were times Aaron hugged her or kissed Jane's forehead while she was in the weight room.

By the fall of 2015, Jane was a regular babysitter for Aaron's family and, as a result, became increasingly close to them. Aaron began referring to Jane as his adopted daughter. In April 2016, Aaron's wife did Jane's hair and makeup for the prom. Shortly thereafter, when Jane received a poor test score, Aaron left an encouraging letter in her locker. As Jane grew closer to Aaron's family, Aaron gave her advice and resources regarding confrontations she was having with her family over religion.

Jane participated in Junior Legislature during her junior and senior years. Aaron was the advisor for this after-school activity. On a Junior Legislature trip, Jane used profanity. In response, Aaron allegedly required that Jane engage in physical

3

activity as punishment. According to Jane, Aaron made her turn around so her back was facing him and her male teammates while she completed the physical activity.

During the summer between her junior and senior years, Jane lived in Boise, Idaho, with her biological mother. Jane remained in contact with Aaron through social media while she was in Boise. Jane returned to Wyoming before the start of her senior year. She was struggling with family conflict and her faith. Jane did not want to attend church with James and her stepmother, Mary and, therefore, felt she needed to move out of the family home. Jane moved in with a local family and went through a period of limited communication with James and Mary. By the winter of 2016, James and Mary moved out of state.

On February 1, 2017, Jane had a conflict with her advisory period teacher, Brent Hibbert. Hibbert mentioned Jane's parents in front of other students. Jane felt Hibbert unnecessarily interfered in her business, angrily left the classroom, and reported the incident to Principal Jeff Makelky. Hibbert was acquainted with Jane's parents and a member of their church. The next day, Jeff allowed Jane to transfer out of Hibbert's advisory class without James's or Mary's permission. According to Jeff, parental consent was not required when a student transferred between advisory periods because it is not a "for credit class." Hibbert called Mary after the incident. He told Mary that Jane became angry when he advised her to speak with her parents and had been allowed to transfer to another advisory class. Mary told Hibbert she would call Jeff to discuss the incident. Shortly thereafter, James called Jeff to discuss Jane.

James called Jeff because he was concerned that Jane transferred from Hibbert's class without his consent. The participants described the conversation as tense. At one point, Jeff indicated he thought James was an absentee parent. James claims he told Jeff he needed to speak with him about a potentially inappropriate relationship between a student and a teacher. James did not, however, recall if he provided details about the nature of Aaron and Jane's relationship and never made a follow-up appointment with Jeff to discuss the issue further. According to Jeff, nothing about the conversation led him to believe James was concerned about sexual harassment or an inappropriate relationship between Jane and Aaron.

Mary claims Hibbert called a second time and suggested Jane and Aaron had become too close. Hibbert told Mary that Jane and Aaron were often alone in his classroom with the door closed. Hibbert testified, however, that he never saw anything inappropriate occur between Jane and Aaron and that his concerns were based on what he had heard from other teachers. Subsequently, Mary called Superintendent and Title IX Coordinator, Steve Loyd, and stated she had heard Jane and Aaron were spending a lot of time together, particularly in the weight room. Loyd said he would look into the matter and get back to her. Similarly, at some point during the year, Hibbert met with Loyd to discuss, inter alia, the relationship between Jane and Aaron.

After receiving Mary's call, Loyd went to the high school to observe Jane and Aaron. He observed the weight room when Aaron was supervising. Jane was in the weight room with other students, the door was propped open; and Loyd did not

5

observe anything out of the ordinary. Loyd also attended a class taught by Aaron in which Jane was a student. Again, he did not observe anything out of the ordinary. Finally, because he was aware Jane was Aaron's "teacher's assistant," Loyd visited Aaron during his planning periods at least twice. On one of those occasions, Loyd discussed concerns about Aaron meeting one-on-one with Jane and advised Aaron to keep the classroom door open. Sometime after these visits occurred, Loyd shared with Mary that he had observed Aaron and Jane and did not think their interactions were cause for concern.

In April of 2017, Jeff was driving past the school and saw Aaron's and Jane's vehicles in the school parking lot on a day school was not in session. Jeff sent a text to Aaron informing Aaron that Jane needed to go home. Jane saw this text on Aaron's phone. Jeff did not enter the building to see what was occurring or confirm Jane had left. Jeff did, however, state he immediately received a response from Aaron indicating Jane was leaving.

A few weeks before graduation, Aaron asked Jane to stay after school to help in his classroom. While they were in the classroom, Aaron massaged Jane's back, kissed her on the forehead, and hugged her. During that hug, Jane could feel that Aaron had an erection. Jane recalled feeling uncomfortable and attempted to leave the room. Aaron told Jane he knew they had feelings for each other upon which they could not act. Jane drove home shaking and in silence, "feeling like a brick."

Jane alleges that after graduation, her encounters with Aaron became more sexual in nature. These encounters included kissing, Aaron touching Jane's breasts,

6

and oral sex. At the end of the summer, Jane left for college. Jane and Aaron purportedly remained in touch through social media.

Jane turned eighteen years old on March 4, 2017; she graduated from Big Piney High School on May 26, 2017. After high school, Jane attended college, graduating with a bachelor's degree in Marriage and Family Studies. She also participated in a religious mission with the Church of Jesus Christ of Latter-day Saints. During this mission, Jane discussed her relationship with Aaron with her mission companion. This was the first time Jane disclosed that her contact with Aaron was sexually inappropriate. After Jane returned from her mission, she began to suffer from, and seek treatment for, anxiety and PTSD resulting from her contact with Aaron. On October 31, 2019, Jane visited her family physician, Dr. Isac Simpson. In response to diagnostic questions, Jane explained to Dr. Simpson that her relationship with Aaron was sexual in nature. After this visit, on November 6, 2019, Dr. Simpson contacted the Sublette County Sheriff's office and explained that Jane had revealed she had been groomed and sexually abused by Aaron while attending Big Piney High School. The Sublette County Sheriff's office investigated Dr. Simpson's report and, ultimately, decided not to charge Aaron.

**B. Procedural Background**

On May 26, 2021, exactly four years after Jane graduated from Big Piney High school, Jane, James, and Mary sued the Board.[3] The Does' complaint set out the

---

[3] The Does filed an amended complaint on September 9, 2021, and a second amended complaint on September 18, 2021. The second amended complaint is the

following four causes of action: (1) "First Claim for Relief—Post-Report Deliberate Indifference in violation of Title IX, 20 U.S.C. § 1681, et. seq."; (2) "Second Claim for Relief—Retaliation in Violation of Title IX, 20 U.S.C. § 1681, et. seq."; (3) "Third Claim for Relief—Disparate Treatment & Impact, in violation of Plaintiff's Constitutional and Federal Rights, Pursuant to 42 U.S.C. § 1983"; and (4) "Fourth Claim for Relief[—]Failure to Train, in Violation of Plaintiffs' Constitutional and Federal Rights, pursuant to 42 U.S.C. § 1983." The third cause of action was set out only on Jane's behalf; claims one, two, and four were set out on behalf of Jane, James, and Mary.[4]

---

operative pleading for purposes of this appeal. Although the Does' second amended complaint supersedes the original complaint's allegations, it does not affect its timing. *May v. Segovia*, 929 F.3d 1223, 1229 (10th Cir. 2019) (discussing Fed. R. Civ. P. 15).

[4] The Board did not question, and the district court did not explore, whether James and/or Mary have statutory standing to raise Title IX claims on their own behalf. In addition to the first and second causes of action, which are specifically based on Title IX, the fourth claim, although nominally arising under § 1983, is critically tethered to Title IX. Section 1681(a) provides, in relevant part, that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." Courts have recognized that to have statutory standing to assert a claim under this provision, a plaintiff must demonstrate the alleged violative conduct excluded that plaintiff from, denied that plaintiff the benefit of, or subjected that plaintiff to discrimination under a federally funded program or activity. *See Rossley v. Drake Univ.*, 958 F.3d 679, 683-85 (8th Cir. 2020) (collecting cases). Parents acting in their individual capacity, rather than as a representative of a minor child, generally do not state an actionable claim under this provision. *See id.*; *see also Seamons v. Snow*, 84 F.3d 1226, 1231 n.5 (10th Cir. 1996) (noting that district court ruled parents did not have individual claims under Title IX). Because the question whether James and/or Mary can state a cause of action under Title IX is one of statutory, rather than Article III standing, *See Dohaish v. Tooley*, 670 F.2d 934, 936-37 (10th Cir. 1982), and because the issue was not raised by the Board, this

The Board moved for summary judgment. It argued the timeliness of the Does'
claims was measured by the four-year limitations period set out in Wyo. Stat. Ann.
§ 1-3-105(a)(iv)(C). Relying heavily on *Varnell*, 756 F.3d at 1212-13, 1215-17, the
Board argued Jane's claims accrued no later than the event a few weeks before
graduation in which Aaron, inter alia, hugged her with an erection. Jane understood
the wrongfulness of Aaron's actions immediately thereafter. As to James's and
Mary's claims, the Board noted they complained in early February of 2017 about the
possibility of an inappropriate relationship between Jane and Aaron. Loyd informed
them within a month, well before graduation, that his investigation had not turned up
anything inappropriate. Thus, the Does' failure-to-train and retaliation claims would
have also accrued well before Jane's graduation.

The district court granted the Board's motion for summary judgment. It ruled
*Varnell* compelled the conclusion that all claims set out in the Does' complaint
accrued before Jane's graduation. Because the Does did not file their complaint until
more than four years later, i.e., four years after the date of Jane's graduation, the
claims fell outside the limitations period set out in Wyo. Stat. Ann. § 1-3-
105(a)(iv)(C).

---

court does not consider whether any of the three claims brought by James and Mary
state valid causes of action.

### III. ANALYSIS

**A. Standard of Review**

This court "reviews the grant of summary judgment de novo, applying the same legal standard used by the district court and examining the record to determine if any genuine issue of material fact was in dispute; if not, we determine if the substantive law was correctly applied." *United States ex rel. Sorenson v. Wadsworth Bros. Constr. Co.*, 48 F.4th 1146, 1159 (10th Cir. 2022) (quotation and alteration omitted). "[W]e view the factual record and draw all reasonable inferences therefrom most favorably to [the Does] as the nonmoving part[ies]." *Id.* (quotation omitted).[5]

**B. Discussion**

Like the district court, we conclude *Varnell* controls whether the Does' claims were filed outside the applicable limitations period. Accordingly, this court begins by setting out *Varnell*'s factual background and relevant holdings in some detail.[6] In *Varnell*, Amber Shaw coached Tori Varnell in several sports. 756 F.3d at 1210. During that time, from approximately January 2005 to early 2007, Shaw "repeatedly

---

[5] The Does assert the district court's "decision should be reversed as it tended to make inferences about the facts in the light least favorable to Jane Doe and her family." Does' Opening Br. at 6. As noted above, however, this concern is not implicated as to the issue of the timeliness of the claims set out in the Does' complaint. *See supra* n.1. And, in any event, because this court's review is de novo, any such error on the part of the district court "has no effect on our review of the issue." *United States ex rel. Grynberg v. Praxair, Inc.*, 389 F.3d 1038, 1047 (10th Cir. 2004).

[6] Surprisingly, especially given its prominence in the Board's summary judgment briefing and in the district court's order granting the Board summary judgment, the Does' opening brief does not contain a single citation to *Varnell*.

sexually abused" Varnell. *Id.* Varnell did not report the abuse because Shaw

"instructed her not to tell anyone and she feared social repercussions." *Id.* at 1210-11.

After she graduated from high school in 2010, Varnell told her "spiritual mentor

about the alleged abuse." *Id.* The mentor told Varnell the conduct she described was

criminal and, if she failed to report Shaw, other girls could suffer abuse. *Id.* This

discussion led Varnell to realize the abuse was not her fault and she had a duty to

protect other girls by reporting Shaw's sexual abuse. *Id.* Varnell reported the abuse to

her mother, who reported the abuse to a school official, who, in turn, reported the

abuse to law enforcement. *Id.* Shaw was, thereafter, indicted by a state grand jury. *Id.*

Almost two years later, in 2012, Varnell was examined by a psychiatrist. *Id.* As of

the date of that examination, the psychiatrist opined as follows:

> [Varnell] did not realize that she was being "emotionally manipulated"
> and did not appreciate the "consequences to her of this two-year training
> epoch during her years of adolescent personality and sexual identity
> formation, or upon her anxiety level." Further, [Varnell] did not
> comprehend how the abuse had "troubled and quietly damaged her," and
> she only began recognizing the harm done to her after speaking to her
> spiritual mentor in 2010. . . . [Varnell] did not fully comprehend the
> emotional and physical damage she had suffered and would suffer
> because of the abuse.

*Id.* (record citations omitted).

Two weeks after her meeting with the psychiatrist, Varnell sued the school

district and district officials. *Id.* She raised, inter alia, claims under Title IX and §

1983. *Id.* The defendants moved to dismiss on the ground Varnell's claims were time

barred. *Id.* The district court granted the defendants' motion to dismiss, concluding

Varnell's federal claims were time barred. *Id.* Varnell appealed, contending "her

federal-law claims are timely (a) because the limitations period was tolled by (i) N.M. Stat. Ann. § 37–1–30 (a child-sexual-abuse statute), (ii) her mental incapacity, and (iii) fraudulent concealment, and (b) because her claims did not accrue until 2010 when she first understood the injury she had suffered." *Id.*

This court affirmed. *Id.* at 1212-17. *Varnell* began by recognizing that because § 1983 does not contain a statute of limitations, "the settled practice [is] to adopt a local time limitation as federal law if it is not inconsistent with federal law or policy to do so." *Id.* at 1212 (quotation omitted). Furthermore, the Supreme Court has held that state limitations period adopted should be the "'general or residual statute for personal injury actions.'" *Id.* (quoting *Owens v. Okure*, 488 U.S. 235, 250 (1989)). It is settled law in this circuit that the applicable statute for Wyoming is, as noted and applied by the district court, the four-year limitations period set out in Wyo. Stat. Ann. § 1–3–105(a)(iv)(C) (setting four-year limitations period for "[a]n injury to the rights of the plaintiff, not arising on contract and not herein enumerated"). *Gee v. Pacheco*, 627 F.3d 1178, 1190 (10th Cir. 2010). *Varnell* further held that the same limitations period that applies to claims under § 1983 also applies to claims based on Title IX. 756 F.3d at 1213. Furthermore, *Varnell* specifically rejected the notion that a special state limitations period applicable to claims of sexual abuse could serve as the borrowed limitations period for claims like those raised by both Varnell and the Does here. *Id.* ("It should be obvious from our above discussion that [New Mexico's special state statute for personal injury caused by childhood sexual abuse] is irrelevant to § 1983 [and Title IX] cases because it does not apply to torts in general.

12

. . . And even if we could do as [Varnell] requests and construe [the special statute] as a tolling provision, it still fails the same general-applicability requirement.").[7]

Having reaffirmed and refined the applicable process this court must undertake in borrowing a state limitations period for Title IX and § 1983 claims, *Varnell* moved on to address the question of claim accrual. *Id.* at 1215-17. It began by recognizing the question of accrual is one of federal, not state law. *Id.* at 1215. *Varnell* held that claims like Varnell's and the Does' are most analogous to the common-law tort of battery.[8] Such claims accrue no later than the date of the last offense contact. *Id.* at 1216. Finally, *Varnell* rejected the assertion that a failure to understand the extent of injury could delay accrual:

> [Varnell] argues that her claims accrued much later because she did not realize the extent of her psychological injury until shortly before filing suit. She relies on what is known as the "discovery rule," which delays accrual of a claim until the plaintiff knew or should have known the facts necessary to establish her cause of action, such as the fact that a surgeon left a sponge in the plaintiff's abdomen after an operation. But even if the discovery rule applies to her § 1983 claim, [Varnell] knew long before she filed suit all the facts necessary to sue and recover damages. Although she may not have known how harmful [Shaw's] abuse was, the cause of action accrues even though the full extent of the injury is not then known or predictable. Were it otherwise, . . . the

---

[7] This aspect of *Varnell*'s holding conclusively disposes of the Does' assertion that the relevant limitations period is the one set out in Wyoming's special limitations period for childhood sexual assault. *See* Wyo. Stat. Ann. § 1-3-105(b). Accordingly, especially given the Does' failure to contest this issue in their opening brief, this court need not, and does not, consider the matter further.

[8] Because they have not addressed the issue on appeal, the Does have waived any argument that some or all claims set out in their complaint are more analogous to a common-law tort other than battery, resulting in an alternate date of accrual. *See Burke v. Regalado*, 935 F.3d 960, 1014 (10th Cir. 2019) ("Issues not raised in the opening brief are deemed abandoned or waived." (quotation omitted)).

statute would begin to run only after a plaintiff became satisfied that he
had been harmed enough, placing the supposed statute of repose in the
sole hands of the party seeking relief.

*Id*. (quotations and citations omitted).[9]

The facts underlying *Varnell* and the facts in the instant case are virtually identical. Accordingly, *Varnell* compels the conclusion that the Does' claims are untimely. The Does' attempts to resist this conclusion can be rejected in short measure. In addition to the arguments already resolved above, the Does make related claims that the district court should have considered pre-assault heightened risk[10] and should have adopted the accrual rule set out by the Sixth Circuit in *Snyder-Hill v. Ohio State Univ.*, 48 F.4th 686 (6th Cir. 2022). The problem for the Does is they do not identify where in the complaint they raise a pre-assault heightened risk claim. Indeed, their first claim is specifically delineated as a post-assault claim. No aspect of the claim focuses on events occurring at Big Piney High School before Aaron's interactions with Jane. Likewise, the second claim in the Does' complaint is a

---

[9] Again, this aspect of *Varnell* conclusively disposes of the Does' argument that Jane did not fully understand the nature and extent of her injuries until she met with a medical professional in 2019 and, therefore, her claims did not accrue until after that appointment. This is also true if the Does' argument in this regard is an attempt to argue for a later accrual date based on an allegation of incapacity. *Varnell*, 756 F.3d at 1214.

[10] For helpful discussions of the differences between "pre-assault heightened risk" and "post-assault" deliberate indifference claims, *see Chapman v. Seuffert*, No. 1:23-cv-00991, 2024 WL 310093, at *6-12 (N.D. Ohio Jan. 26, 2024), and *V.E. v. Univ. of Md. Balt. Cnty*, No. 1:22-cv-02338, 2023 WL 3043772, at *3-6 (D. Md. April 21, 2023).

retaliation claim focusing on the Board's reaction after it was allegedly informed of an inappropriate relationship between Aaron and Jane. The third claim, brought only by Jane, asserts the harassment she suffered violated the equal protection clause of the Fourteenth Amendment. Finally, the Doe's fourth and final claim is a failure to train claim. While it is certainly true that certain aspects of this claim focus on the Board's actions prior to Aaron's harassment of Jane, the Does make no effort in their appellate briefing to explain how or why, under the facts of this case, their failure-to-train claim falls within the narrow rubric of a pre-assault heightened risk claim. They cite no authority to support such a proposition and make no argument analogizing their particular failure-to-train claim to the pre-assault heightened risk claim at issue in *Snyder-Hill*.[11] Because the Does did not advance a pre-assault heightened risk claim, the district court did not err in failing to consider such a claim. And, because *Varnell* provides the rule of law as to the accrual of post-assault deliberate indifference claims, the district court properly applied *Varnell* to determine the claims set out in the Does' complaint were untimely under Wyoming's four-year limitations period.

---

[11] The factual allegations in *Snyder-Hill* are extreme. It was plausibly alleged therein that a large public university undertook a two-decades long campaign to cover-up, facilitate, and normalize sexual abuse of students by a physician employed by the university. 48 F.4th at 691-93. It was also plausibly alleged that, given the university's actions, no reasonable student would have been able to discover that the university's own actions exposed the students to a danger of abuse should they come into contact with the physician. *Id.* at 691-97. Here, there is no allegation, let alone evidence, of a coordinated campaign on the part of the Board to cover-up its training regime, either before or in the aftermath of Aaron's alleged harassment and assault of Jane.

Finally, pointing to the fact Jane engaged in a sexual relationship with Aaron during the summer after her graduation, the Does assert their claims are rendered timely under the continuing-violation doctrine. This assertion is inadequately briefed and, thus, waived. *See Burke*, 935 F.3d at 1014. The Does do not cite to a single relevant authority, let alone authorities addressing whether and how the doctrine could relate to the claims set out in the Does' complaint. Moreover, the Does simply assume Aaron's acts during the summer after graduation amount to violations of their Title IX and Fourteenth Amendment rights on the part of the Board. As noted by the Board, however, this is a highly debatable proposition given that, at the time, both Aaron and Jane were adults and, arguably, Aaron was not under the control of the Board. *See, e.g.*, *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 644-47 (1999) (discussing the parameters of liability under Title IX). In its order granting the Board summary judgment, the district court noted this exact failure in concluding the continuing-violations doctrine did not render the Does' claims timely. Absent truly meaningful briefing on the issue, this court declines to opine as to the applicability and parameters of the continuing-violations doctrine in Title IX and § 1983 cases like the instant case.

## IV. CONCLUSION

The Does have failed to demonstrate the district court erred in concluding, based on *Varnell*, the claims set out in the complaint are untimely. Thus, the

judgment of the United States District Court for the District of Wyoming is hereby

**AFFIRMED**.

Entered for the Court


Michael R. Murphy
Circuit Judge